# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 27, 2005          Decided June 30, 2006

No. 04-1368

IN RE: CORE COMMUNICATIONS, INC.
PETITIONER

LEVEL 3 COMMUNICATIONS, LLC, ET AL.,
INTERVENORS

Consolidated with
04-1423, 04-1424

*Michael B. Hazzard* argued the cause for petitioner Core Communications, Inc. With him on the briefs was *Deborah J. Israel*.

*Scott H. Angstreich* argued the cause for petitioner BellSouth Corporation and ILEC Intervenors. With him on the briefs were *Bennett L. Ross*, *Robert B. McKenna, Jr.*, *Gary L. Phillips, James P. Lamoureux*, *Michael E. Glover*, and *Edward Shakin*.

*Joel Marcus*, Counsel, Federal Communications Commission, argued the cause for respondent. With him on the brief were *Thomas O. Barnett*, Acting Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, *Samuel L. Feder*, Acting General Counsel, Federal Communications Commission, *Jacob M.*

*Lewis*, Associate General Counsel, *John E. Ingle*, Deputy Associate General Counsel, and *Laurence N. Bourne*, Counsel. *Nandan M. Joshi*, Counsel, entered an appearance.

*Christopher J. Wright* argued the cause for CLEC Intervenors. With him on the brief were *Richard M. Rindler, John T. Nakahata*, and *Timothy J. Simeone.*

*Bennett L. Ross, Robert T. McKenna, Jr., Scott H. Angstreich, Gary L. Phillips, James P. Lamoureux, Michael E. Glover,* and *Edward Shakin* were on the brief of ILEC Intervenors in support of respondent.

Before: SENTELLE, TATEL, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: In its *ISP Remand Order*, the Federal Communications Commission (FCC) adopted four interim, intercarrier compensation rules to govern telecommunications traffic bound for Internet service providers. Core Communications, Inc., a competitive local exchange carrier, filed a petition asking the FCC to forbear from applying those rules pursuant to 47 U.S.C. § 160(a). The FCC denied Core's petition with respect to two of the rules and granted it with respect to the other two. Core then filed a petition for review in this court, seeking reversal of the FCC's partial denial of its petition for forbearance. We consolidated Core's petition for review with its mirror image: a petition for review filed by BellSouth Corporation, an incumbent local exchange carrier, seeking reversal of the FCC's partial grant of Core's petition for forbearance. For the reasons discussed below, we now deny both petitions.

3

I

Before high-speed broadband connections (such as cable modem and digital subscriber line (DSL) service) became widely available, consumers generally gained access to the Internet through "dial-up" connections provided by local telephone companies. Under the dial-up method, a consumer uses a line provided by a local exchange carrier (LEC) -- usually an incumbent local exchange carrier (ILEC) -- to dial the local telephone number of an Internet service provider (ISP), which then connects the call to the Internet. Typically, the ISP does not subscribe to the ILEC, but instead subscribes to another LEC -- a competitive local exchange carrier (CLEC) -- that interconnects with the incumbent. Accordingly, a consumer who dials-up to the Internet usually obligates an originating ILEC to transfer the call to a CLEC, which then delivers the call to the ISP.

Although this relay is imperceptible to the caller, how the call is paid for matters a great deal to the participating telecommunications carriers. Section 251(b)(5) of the Communications Act of 1934, as amended by the Telecommunications Act of 1996 (the "Act"), requires LECs to "establish reciprocal compensation arrangements for the transport and termination of telecommunications." 47 U.S.C. § 251(b)(5). Under a reciprocal compensation arrangement, "[w]hen a customer of carrier A makes a local call to a customer of carrier B, and carrier B uses its facilities to connect, or 'terminate,' that call to its own customer, the 'originating' carrier A is ordinarily required to compensate the 'terminating' carrier B for the use of carrier B's facilities." *SBC Inc. v. FCC*, 414 F.3d 486, 490 (3d Cir. 2005) (citing *Global NAPS, Inc. v. FCC*, 247 F.3d 252, 254 (D.C. Cir. 2001)).

If ISP-bound traffic were governed by § 251(b)(5), then reciprocal compensation arrangements would be required for the ILEC-to-CLEC hand-off described above, and ILECs would be required to compensate CLECs for completing their customers' calls to ISPs. Whether ISP-bound traffic is so governed is a question that has been the subject of two prior FCC orders and two prior decisions of this court. We briefly recount that history and then describe Core's subsequent petition for forbearance.

A

In 1996, the FCC construed the "reciprocal compensation arrangements" provision of § 251(b)(5) to "apply only to traffic that originates and terminates within a local area." *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd 15499, 16013, ¶ 1034 (1996). Although that initial pronouncement did not address whether dial-up calls to an ISP for connection to the Internet are local or non-local, the Commission concluded in its 1999 *Declaratory Ruling* that such calls are non-local, and thus that § 251(b)(5) is inapplicable. *See Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Inter-Carrier Compensation for ISP-Bound Traffic*, 14 FCC Rcd 3689 (1999) ("*Declaratory Ruling*"). Instead, the FCC concluded that ISP-bound calls constitute interstate traffic, subject to FCC jurisdiction under § 201 of the Act.[1] *See id.* at

---

[1]Section 201 provides, in relevant part:

> (a) It shall be the duty of every common carrier engaged in interstate . . . communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission . . . finds such action necessary or desirable in the public interest, to

3690, ¶ 1; *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP-Bound Traffic*, 16 FCC Rcd 9151, 9152, ¶ 1 (2001) ("*ISP Remand Order*") (construing the *Declaratory Ruling*). In *Bell Atlantic Telephone Cos. v. FCC*, however, this court found that the Commission had inadequately explained its conclusion that ISP-bound traffic is non-local, and therefore vacated and remanded the *Declaratory Ruling*. *See* 206 F.3d 1, 7-8 (D.C. Cir. 2000).

In 2001, the FCC responded to our decision in *Bell Atlantic* with the *ISP Remand Order*. Once again, the Commission concluded that calls delivered to ISPs are not subject to the mandatory reciprocal compensation obligations of § 251(b)(5). *See ISP Remand Order*, 16 FCC Rcd at 9154, ¶ 3. Rather than basing its conclusion on a determination that ISP-bound calls are non-local and hence not subject to § 251(b)(5), this time the Commission relied on a different statutory section, 47 U.S.C. § 251(g).[2] *See id.* at 9153, ¶ 1. According to the FCC, § 251(g)

---

establish . . . charges applicable thereto and the divisions of such charges . . . .

(b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful . . . .

47 U.S.C. § 201.

[2]Section 251(g) provides, in relevant part:

On and after [the date of enactment of the Telecommunications Act of 1996,] each local exchange carrier . . . shall provide exchange access, information

was intended to exclude the kinds of traffic enumerated in that subsection, specifically "'exchange access, information access, and exchange services for such access,'" from the reciprocal compensation requirements of subsection (b)(5). *Id.* at 9166-67, ¶ 34 (quoting § 251(g)). And it found that calls made to ISPs located within the caller's local calling area fall within those enumerated categories -- specifically, that they involve "information access." *Id.* at 9171, ¶ 42; *see Bell Atlantic*, 206 F.3d at 2. Those calls, the FCC concluded, are thus not subject to § 251(b)(5), but are instead subject to the FCC's regulatory authority under § 201. *See id.* at 9152-53, ¶ 1; *id.* at 9165, ¶ 30; *id*. at 9175-81, ¶¶ 52-65; *see also supra* note 1 (quoting § 201).

Having concluded "that intercarrier compensation for ISP-bound traffic is within the jurisdiction of th[e] Commission under section 201 of the Act," the FCC sought "to establish an appropriate cost recovery mechanism for delivery of this traffic." *Id.* at 9154, ¶ 4. In considering the possible alternatives, the FCC noted that "the existing intercarrier compensation mechanism . . . , in which the originating carrier pays the carrier that serves the ISP, has created opportunities for regulatory arbitrage and distorted the economic incentives related to competitive entry into the local exchange and

> access, and exchange services for such access to interexchange carriers and information service providers in accordance with the same equal access and nondiscriminatory interconnection restrictions and obligations (including receipt of compensation) that apply to such carrier on the date immediately preceding [the date of enactment] under any . . . regulation, order, or policy of the Commission, until such restrictions and obligations are explicitly superseded by regulations prescribed by the Commission after [such date of enactment].

47 U.S.C. § 251(g).

exchange access markets." *Id.* at 9153, ¶ 2. The FCC explained the different considerations attendant to traditional telephone service and Internet dial-up in this way:

> Traditionally, telephone carriers would interconnect with each other to deliver calls to each other's customers. It was generally assumed that traffic back and forth on these interconnected networks would be relatively balanced. Consequently, to compensate interconnecting carriers, mechanisms like reciprocal compensation were employed, whereby the carrier whose customer initiated the call would pay the other carrier the costs of using its network.
>
> []Internet usage has distorted the traditional assumptions because traffic to an ISP flows exclusively in one direction, creating an opportunity for regulatory arbitrage and leading to uneconomical results. Because traffic to ISPs flows one way, so does money in a reciprocal compensation regime. It was not long before some LECs saw the opportunity to sign up ISPs as customers and collect, rather than pay, compensation because ISP modems do not generally call anyone in the exchange.

*Id.* at 9162, ¶¶ 20-21. The Commission described the market distortions that result from applying a reciprocal compensation regime to such a "large volume[] of traffic that is virtually all one-way -- that is, delivered to the ISP," *id.* at 9153, ¶ 2, as follows:

> Because intercarrier compensation rates do not reflect the degree to which the carrier can recover costs from its end-users, payments from other carriers may enable a carrier to offer service to its customers at rates that

bear little relationship to its actual costs . . . . Carriers thus have the incentive to seek out customers, including but not limited to ISPs, with high volumes of incoming traffic that will generate high reciprocal compensation payments. To the extent that carriers offer these customers below cost retail rates subsidized by intercarrier compensation, these customers do not receive accurate price signals. Moreover, because the originating LEC typically charges its customers averaged rates, the originating end-user receives inaccurate price signals as the costs associated with the intercarrier payments are recovered through rates averaged across all of the originating carriers' end users.

*Id.* at 9182, ¶ 68 (internal citations omitted). "For these reasons," the Commission concluded, "we believe that the application of . . . reciprocal compensation[] to ISP-bound traffic undermines the operation of competitive markets." *Id.* at 9183, ¶ 71.

After concluding that a reciprocal compensation mechanism results in market distortions, the FCC announced that it was issuing -- in tandem with its *ISP Remand Order* -- a notice of proposed rulemaking to consider whether the Commission should replace existing intercarrier compensation schemes with a "bill-and-keep" regime. *Id.* at 9153, ¶ 2; *see Notice of Proposed Rulemaking, In the Matter of Developing a Unified Intercarrier Compensation Regime*, 16 FCC Rcd 9610 (2001) ("*NPRM*"). Under such a regime, "neither of two interconnecting networks charges the other for terminating traffic that originates on the other network. Instead, each network recovers [its costs] from its own end-users." *Id.* at 9153 n.6. Thus, in the typical scenario discussed above, the originating ILEC would recover its costs from its customer who

initiated the call, while the CLEC would recover its costs from its ISP customer to which it delivered the call. The Commission concluded "that a bill and keep regime for ISP-bound traffic may eliminate the[] incentives and concomitant opportunity for regulatory arbitrage by forcing carriers to look only to their ISP customers, rather than to other carriers, for cost recovery. As a result, the rates paid by ISPs and, consequently, their customers should better reflect the costs of services to which they subscribe." *Id.* at 9184, ¶ 74.

Although the FCC issued the *NPRM* looking toward a bill-and-keep regime, the Commission nonetheless deemed it "prudent to avoid a 'flash cut' to a new compensation regime that would upset the legitimate business expectations of carriers and their customers." *Id.* at 9186, ¶ 77. It therefore adopted "an interim intercarrier compensation regime for ISP-bound traffic that serves to limit, if not end, the opportunity for regulatory arbitrage, while avoiding a market-disruptive 'flash cut' to a pure bill and keep regime." *Id.* at 9186-87, ¶ 77. The interim regime, the FCC said, "will govern intercarrier compensation for ISP-bound traffic until we have resolved the issues raised in the intercarrier compensation *NPRM*." *Id.* at 9187, ¶ 77. Four provisions of the interim regime are relevant to the instant matter:

*Rate Caps*. The Commission adopted "rate caps," which established a gradually declining maximum rate that a carrier (typically, a CLEC) could charge another carrier (typically, an ILEC) for delivering a call to an ISP. *See id.* at 9187, ¶ 78. Although the rate caps limited how much carriers could recover from other carriers, the carriers remained free to recover "[a]ny additional costs . . . from end-users," that is, from their own customers. *Id.* at 9156, ¶ 4; *see id.* at 9187, ¶ 78; *see also Petition of Core Communications, Inc. for Forbearance Under*

*47 U.S.C. § 160(c) from Application of the* ISP Remand Order, 19 FCC Rcd 20179, 20181, ¶ 6 (2004) ("*Forbearance Order*").

*Mirroring Rule.* As an adjunct to the rate caps, the Commission established a "mirroring rule," which provided that the rate caps on ISP-bound traffic would apply only if the ILEC also offered to charge the CLEC the same capped rate to terminate local traffic that originated on the CLEC's network. *See ISP Remand Order*, 16 FCC Rcd at 9193, ¶ 89; *see also Forbearance Order*, 19 FCC Rcd at 20181-82, ¶ 8.

*Growth Caps.* In addition to the rate caps, the Commission adopted "growth caps," which imposed a limit on the total number of ISP-bound minutes for which a carrier could receive intercarrier compensation. *See ISP Remand Order*, 16 FCC Rcd at 9191, ¶ 86. The caps were equal to the total ISP-bound minutes for which the LEC was previously entitled to compensation, plus a 10 percent annual growth factor for each of the first two years under the interim regime. Beyond the caps, ISP-bound traffic had to be exchanged on a bill-and-keep basis. *See id.* at 9156, ¶ 7; *id.* at 9187, ¶78; *see also Forbearance Order*, 19 FCC Rcd at 20181, ¶ 7; *id.* at 20187-88, ¶ 24.

*New Markets Rule.* Finally, the Commission adopted a "new markets rule," which denied intercarrier compensation for ISP-bound traffic in markets where the carrier was "not exchanging traffic pursuant to [an] interconnection agreement[] prior to adoption" of the Order. *ISP Remand Order*, 16 FCC Rcd at 9188, ¶ 81. "In such a case, . . . carriers shall exchange ISP-bound traffic on a bill-and-keep basis during th[e] interim period." *Id.*; *see Forbearance Order*, 19 FCC Rcd at 20182, ¶ 9.

As the FCC explained, these four interim provisions were intended "to eliminate arbitrage opportunities presented by the existing recovery mechanism for ISP-bound [traffic] by lowering payments and capping growth." *ISP Remand Order*, 16 FCC Rcd at 9155, ¶ 7. The goal of the interim provisions was "decreased reliance by carriers upon carrier-to-carrier payments and an increased reliance upon recovery of costs from end-users, consistent with the tentative conclusion in the *NPRM* that bill and keep is the appropriate intercarrier compensation mechanism for ISP-bound traffic." *Id.* at 9156, ¶ 7.

We reviewed the *ISP Remand Order* in *WorldCom, Inc. v. FCC*, 288 F.3d 429 (D.C. Cir. 2002). There, we rejected the FCC's conclusion that § 251(g) authorized the Commission to carve out ISP-bound calls from the requirements of § 251(b)(5). *See id.* at 430. "Because that section is worded simply as a transitional device," we held, the FCC cannot rely on § 251(g) to exclude ISP-bound calls from the scope of § 251(b)(5). *Id.* Nonetheless, in light of the possibility that there were "other legal bases for adopting the rules chosen by the Commission . . . , we neither vacate[d] the order nor address[ed] petitioners' attacks on various interim provisions devised by the Commission." *Id.* Instead, we merely remanded the matter to the Commission for further proceedings, which left the interim rules in effect pending those proceedings. *See id.* at 434; *see also Forbearance Order*, 19 FCC Rcd at 20182, ¶ 10.

B

The Telecommunications Act of 1996 requires the FCC to "forbear from applying any regulation or any provision" of the Act if it makes three determinations that we discuss in detail in Part II.B below. 47 U.S.C. § 160(a). The Act authorizes any telecommunications carrier to submit a petition to the FCC requesting such forbearance. *See id.* § 160(c). The Commission

must act upon the petition within one year, subject to its right to extend that deadline by an additional 90 days. *See id.*

On July 14, 2003, Petitioner Core Communications -- a CLEC -- filed a petition asking the FCC to forbear from applying the four interim provisions of the *ISP Remand Order* discussed above. After receiving the petition, the Commission exercised its authority to extend the one-year deadline by 90 days. That extension moved the deadline to October 11, 2004. On October 8, 2004, the Commission voted to adopt an order granting in part and denying in part Core's petition. In a press release issued on the day of the vote, the FCC announced the outcome of its decision and stated that "[a]n order detailing the FCC's analysis will be forthcoming." Joint Appendix (J.A.) 135.[3] On October 18, 2004, ten days after the vote and seven days after the statutory deadline, the Commission released the text of its *Forbearance Order* addressing Core's forbearance petition. *See* 19 FCC Rcd 20179. The *Forbearance Order* stated that it "shall be effective" as of the October 8, 2004 adoption date. *Id.* at 20189, ¶ 30 (capitalization altered).

As the press release indicated it would, the FCC granted in part and denied in part Core's forbearance petition. The Commission denied Core's petition with respect to the rate caps and mirroring rule, concluding that those provisions remained necessary to avoid "[regulatory] arbitrage and market distortions." *Id.* at 20186, ¶ 18. However, the FCC granted the request to forbear from enforcing the growth caps and new markets rule, concluding that they were no longer needed because "[m]arket developments since 2001 have eased the

---

[3]The press release also contained the following routine disclaimer: "This is an unofficial announcement of Commission action. Release of the full text of a Commission order constitutes official action." J.A. 135.

concerns about growth of dial-up ISP traffic that" had prompted their adoption. *Id.* at 20186, ¶ 20.

We now have before us two petitions for review of the FCC's *Forbearance Order*. Core contends that the FCC should not only have granted forbearance regarding the growth caps and new markets rule, but should also have granted forbearance regarding the rate caps and mirroring rule. A group of ILECs led by BellSouth takes the opposite position. It contends that the FCC should not have granted forbearance from enforcement of any of the provisions, and hence challenges the FCC's decision to forbear from enforcing the growth caps and new markets rule. We consider Core's arguments in Part II and BellSouth's arguments in Part III.

II

Core raises two principal challenges to the FCC's denial of its request to forbear from enforcing the rate caps and mirroring rule. First, Core argues that the FCC issued its denial belatedly, and that under the statute the FCC's tardiness must be regarded as granting the forbearance petition in its entirety. Second, in the event that its first argument fails, Core challenges the denial of forbearance with respect to the rate caps and mirroring rule as arbitrary and capricious.[4]

---

[4]We reject, without further discussion, Core's suggestion that the denial of forbearance contravenes our decision in *WorldCom*. The *WorldCom* court could not have been clearer in declaring: "[W]e do not decide petitioners' claims that the interim pricing limits imposed by the Commission are inadequately reasoned." 288 F.3d at 434. We also summarily reject Core's suggestion that its forbearance petition asked the FCC to forbear from applying the *ISP Remand Order* in its entirety -- not simply with respect to the four interim provisions that the FCC addressed in its *Forbearance Order* -- and thus that all the

14

A

The second sentence of § 160(c) declares that a petition for forbearance "shall be deemed granted if the Commission does not deny the petition" within one year of receiving it. 47 U.S.C. § 160(c). The third sentence permits the Commission to extend the one-year period by an additional 90 days. *Id.* And the fourth sentence states that the "Commission may grant or deny a petition in whole or in part and shall explain its decision in writing." *Id.* Core asserts that the FCC missed the § 160(c) deadline by not issuing a written order denying its petition until October 18, seven days after the (extended) statutory deadline of October 11. As a consequence, Core insists, its petition for forbearance must be "deemed granted" in full.

The Commission counters that the announcement of its October 8, 2004 vote satisfied the requirement that it "deny the petition" by the statutory deadline, and that therefore the petition may not be "deemed granted." The deadline, the Commission insists, applies only to the denial and not to the separate requirement of a written explanation: "The two sentences in section 160(c) impose separate and independent obligations on the Commission." FCC Br. 18. In any event, the Commission continues, an FCC regulation permits the Commission to "'designate,'" as it did here, "'an effective date that is . . . earlier

---

unaddressed provisions of the *ISP Remand Order* are "deemed granted." 47 U.S.C. § 160(c). The only provisions of the *ISP Remand Order* against which Core mounted arguments under § 160(a) -- indeed, the only provisions that Core specifically mentioned at all -- were the four interim provisions. *See Core's Petition for Forbearance* (J.A. 22-35).

. . . in time'" than the date upon which an order is released. *Id.* (quoting 47 C.F.R. § 1.103(a)).

Under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), this court would ordinarily accord deference to the Commission's interpretation of a statutory provision like § 160(c). Core contends that no such deference is due here. This contention is based, in part, on the fact that the FCC's interpretation of § 160(c) is contained only in the litigation briefs of FCC counsel, and not in a Commission order. *See generally United States v. Mead Corp.*, 533 U.S. 218, 228 (2001).

But there is good reason why the FCC did not address the meaning of the statute in an order: Core never raised the issue before the Commission. That fact does not merely create a problem regarding the extent of deference we owe the FCC's statutory interpretation; it creates a problem regarding our authority to review the issue at all. Under 47 U.S.C. § 405(a), the "filing of a petition for reconsideration" is a "condition precedent to judicial review" of any FCC order "where the party seeking such review . . . relies on questions of fact or law upon which the Commission . . . has been afforded no opportunity to pass." 47 U.S.C. § 405(a). This circuit has strictly construed that section, holding that we "generally lack jurisdiction to review arguments that have not first been presented to the Commission." *BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1182 (D.C. Cir. 2003); *see, e.g.*, *American Family Ass'n, Inc. v. FCC*, 365 F.3d 1156, 1166 (D.C. Cir. 2004); *New England Pub. Commc'ns Council, Inc. v. FCC*, 334 F.3d 69, 79 (D.C. Cir. 2003); *Sioux Valley Rural Television, Inc. v. FCC*, 349 F.3d 667, 676 (D.C. Cir. 2003).

*Time Warner Entertainment Co. v. FCC*, 144 F.3d 75 (D.C. Cir. 1998), cited by Core, is not to the contrary. That case held

that, where "the formulation of the issue presented to us was not precisely as presented to the Commission," we will nonetheless review it if "a reasonable Commission *necessarily* would have seen the question raised before us as part of the case presented to it." 144 F.3d at 81 (emphasis in original); *see AT&T Corp. v. FCC*, 317 F.3d 227, 235 (D.C. Cir. 2003). Core's problem, however, is not that it failed to present the issue to us "precisely" as it presented the issue to the Commission. The problem is that it failed to present the issue to the Commission in any form whatsoever.

Of course, Core, too, had good reason not to address, in its forbearance petition, whether a timely denial of that petition would require a written decision or only the announcement of the Commission's vote: Core could not have known, when it filed the petition, that the FCC would wait to issue its written denial until after the October 11 deadline had passed. Adhering to the language of § 405(a), however, we have held that, even when a petitioner has no reason to raise an argument until the FCC issues an order that makes the issue relevant, the petitioner must file "a petition for reconsideration" with the Commission before it may seek judicial review. 47 U.S.C. § 405(a); *see AT&T Corp. v. FCC*, 86 F.3d 242, 246 (D.C. Cir. 1996). Core did not file such a petition in this case.

None of the foregoing should be understood to place this court's imprimatur on the FCC's actions. Waiting until the eleventh hour to vote on a forbearance petition, and then waiting until the thirteenth hour to issue the explanatory order, is hardly an ideal procedure for notifying a party of the disposition of a petition. And relying on an informal press release and a back-dating regulation to satisfy a statutory deadline could unnecessarily place Commission policies at risk of judicial invalidation. Nonetheless, because Core did not give the

Commission an opportunity to address the question, we cannot be the first authority to construe the meaning of § 160(c).

B

We review the Commission's order denying in part Core's petition for forbearance under the familiar "arbitrary and capricious" standard. *See* 5 U.S.C. § 706(2)(A); *Cellular Telecomms. & Internet Ass'n v. FCC*, 330 F.3d 502, 507 (D.C. Cir. 2003); *AT&T Corp. v. FCC*, 236 F.3d 729, 734 (D.C. Cir. 2001). Under that standard, our scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Cellular Telecomms.*, 330 F.3d at 507. The agency must, however, "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

Section 160(a) requires the FCC to "forbear from applying any regulation or provision [of the Act] . . . to a telecommunications carrier or telecommunications service" if it determines that

> (1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;

> (2) enforcement of such regulation or provision is not necessary for the protection of consumers; *and*

(3) forbearance from applying such provision or regulation is consistent with the public interest.

47 U.S.C. § 160(a) (emphasis added). These three prongs of the forbearance test "are conjunctive," meaning that "[t]he Commission could properly deny a petition for forbearance if it finds that any one of the three prongs is unsatisfied." *Cellular Telecomms.*, 330 F.3d at 509. In this case, the Commission found that "none of the three prongs is satisfied with respect to the rate caps and mirroring rule." *Forbearance Order*, 19 FCC Rcd at 20184, ¶ 15. We now proceed to examine the reasonableness of the FCC's determination.

1. Core does not contend that there has been any change in circumstances since the *ISP Remand Order* rendering enforcement of the rate caps no longer "necessary to ensure that the charges [and] practices" of CLECs serving ISPs "are just and reasonable and are not unjustly or unreasonably discriminatory." 47 U.S.C. § 160(a)(1). Instead, Core challenges the *ISP Remand Order* itself, contending that its imposition of rate caps on ISP-bound traffic was unreasonably discriminatory. It argues that, while "the cost of terminating ISP-bound traffic is the same as any other type of traffic," the FCC has permitted "substantially higher termination rates for other types of traffic, notably long distance traffic." Core Br. 37. "This means," Core explains, "that certain carriers earn more revenue for terminating certain types of traffic while other carriers earn less, even though all traffic cost[s] the same." *Id.*

In rejecting this argument, the FCC reasonably concluded that the potential for discrimination *against* ISP-serving CLECs is limited because, as a consequence of the mirroring rule, "the caps apply to ISP-bound traffic only if an incumbent LEC offers to exchange all section 251(b)(5) traffic at the same rate." *Forbearance Order*, 19 FCC Rcd at 20187, ¶ 23. That is, the

mirroring rule "prevent[s] disparate treatment of the two types of traffic." *Id.* Moreover, the different characteristics of the two kinds of service -- particularly the fact that "traffic to ISPs flows one way, [as] does money in a reciprocal compensation regime," *ISP Remand Order* at 9162, ¶ 21 -- precludes describing any residual difference in treatment as unreasonably discriminatory. And the FCC further explained that the rate caps are necessary to prevent discrimination *between* dial-up Internet access customers and basic telephone service customers. The rate caps, the FCC stated, "were implemented to prevent the subsidization of dial-up Internet access customers at the expense of consumers of basic telephone service." *Id.* at 20188, ¶ 25.

2. Core makes largely the same argument with respect to the second prong of § 160(a). Enforcement of the rate caps "is not necessary for the protection of consumers," § 160(a)(2), Core argues, because the cost of terminating dial-up Internet traffic and voice traffic is the same. Thus, it contends, "the only way to treat consumers on a nondiscriminatory basis is by enabling all carriers to recover the same termination costs with the same termination rate, such that no consumer has to bear a disproportionate share of network costs." Core Br. 38.

But this argument does not render unreasonable the FCC's view that the rate caps are necessary to prevent the subsidization of dial-up Internet access consumers by consumers of basic telephone service. *See Forbearance Order*, 19 FCC Rcd at 20188, ¶ 25. The FCC does not contend that subsidization arises because the costs of dial-up and voice traffic are different, but rather because "the large one-way flows of cash" in a reciprocal compensation regime "ma[k]e it possible for LECs serving ISPs to afford to pay [the ISPs] to use their services, potentially driving ISP rates to consumers to uneconomical levels." *ISP Remand Order*, 16 FCC Rcd at 9162, ¶ 21; *see id.* at 9182-84, ¶¶ 68-71. Moreover, "because the originating LEC typically

charges its customers averaged rates, . . . the costs associated with the intercarrier payments are recovered through rates averaged across all of the originating carrier's end-users," including particularly consumers of regular voice telephone service. *Id.* at 9182, ¶ 68. The FCC concluded that "[t]here is no public policy rationale to support a subsidy running from all users of basic telephone service to those end users who employ dial-up Internet access," *id.* at 9192, ¶ 87, and that the caps were thus necessary to protect consumers of basic telephone service, *see Forbearance Order*, 19 FCC Rcd at 20188, ¶ 25. Core's argument does not undercut the reasonableness of this conclusion.

3. With minor differences, Core reprises the same argument with respect to the third prong of § 160(a), the requirement that "forbearance from applying" the rate caps must be "consistent with the public interest." 47 U.S.C. § 160(a)(3). The caps are inconsistent with that interest, Core insists, because they unreasonably "discriminat[e]" against ISPs, and because they "deter[] investment in competitive networks" by capping the ability of CLECs to "recover costs at a level materially below the [ILECs'] cost-based rate for providing the same termination function." Core Br. 38. Core derides the FCC's determination that the caps are necessary to prevent "regulatory arbitrage" and "distorted economic incentives" as "nothing more than imprecise, never-defined, FCC econo-babble." *Id.* at 39.

With respect to Core's contention that the rate caps deter investment in competitive telecommunications networks, the FCC found that "Core provide[d] no evidence to support the[] claim[]." *Forbearance Order*, 19 FCC Rcd at 20185, ¶ 18. Indeed, examination of Core's Petition for Forbearance reveals that the FCC is correct: Core offered no evidence on that issue nor on its broader contention that "the *ISP Remand Order* has forced CLECs from the market." *Core's Petition for*

*Forbearance* 10 (J.A. 33). Core, moreover, cites no such evidence on this appeal.

The derision that Core levels at the FCC's terminology is similarly unwarranted. The FCC's economic analysis is neither imprecise nor undefined. We have quoted it at length in Part I.A to make that clear. In a nutshell, the FCC determined in the *ISP Remand Order* that, because ISP-related traffic flows overwhelmingly in one direction, a reciprocal compensation regime creates an opportunity for CLECs "to sign up ISPs as customers and collect [compensation from], rather than pay [] compensation" to, other carriers. *ISP Remand Order*, 16 FCC Rcd at 9162, ¶ 21. In the FCC's view, "this led to classic regulatory arbitrage" that had two negative effects: "(1) it created incentives for inefficient entry of LECs intent on serving ISPs exclusively and not offering viable local telephone competition, as Congress had intended to facilitate with the 1996 Act; (2) the large one-way flows of cash made it possible for LECs serving ISPs to afford to pay their own customers to use their services, potentially driving ISP rates to consumers to uneconomical levels." *Id.* at 9162, ¶ 21.

The question before us is not whether the FCC's economic conclusions are correct or are the ones that we would reach on our own, but only whether they are reasonable. *See Teledesic LLC v. FCC*, 275 F.3d 75, 84 (D.C. Cir. 2001). As we have previously stated, we will not "second-guess" an agency's economic analysis, but will uphold regulations based on such an analysis if the agency "has established in the record a reasonable basis for its decision." *National Wildlife Fed'n v. EPA*, 286 F.3d 554, 566 (D.C. Cir. 2002) (internal quotation marks omitted). Core offers no ground for concluding that the FCC's analysis is unreasonable.

\* \* \* \* \*

Although Core's petition for review challenged the FCC's denial of forbearance as to both the rate caps and the mirroring rule, Core clarified at oral argument that, if it lost its challenge to the former, it would withdraw its challenge to the latter. *See* Oral Arg. Tr. at 25. That is a logical strategy, since the mirroring rule does no harm to Core and may do it some good: If the rate caps remain in place, the mirroring rule imposes equivalent caps on the rates that an ILEC may charge Core. Having ruled against Core's challenge to the rate caps, we therefore do not address its challenge to the mirroring rule.

III

Taking the opposite tack from Core, the ILECs contend that the FCC acted impermissibly in granting Core's forbearance petition regarding the growth caps and new markets rule. The FCC found that "all three prongs" of the forbearance standard were met with respect to those provisions. *Forbearance Order*, 19 FCC Rcd at 20184, ¶ 15. Once again, we review the FCC's decision under the arbitrary and capricious standard. *See Cellular Telecomms.*, 330 F.3d at 507.

A

As discussed in Part I.A, the growth caps placed a limit on the total ISP-bound minutes for which a CLEC could receive intercarrier compensation, equal to the total ISP-bound traffic for which the CLEC was previously entitled to compensation, plus a 10% growth factor for each of the first two years of the transition. In the *ISP Remand Order*, the FCC explained that it adopted the measure "to ensure that growth in dial-up Internet access [did] not undermine [FCC] efforts to limit intercarrier compensation for this traffic and to begin, subject to the conclusion of the *NPRM* proceedings, a smooth transition toward a bill and keep regime." *ISP Remand Order,* 16 FCC

Rcd at 9191, ¶ 86. "A ten percent growth cap, for the first two years," the FCC stated, "seem[ed] reasonable in light of CLEC projections that the growth of dial-up Internet minutes will fall in the range of seven to ten percent per year." *Id.*

The FCC's new markets rule precluded intercarrier compensation for ISP-bound traffic where the carrier was "not exchanging traffic pursuant to [an] interconnection agreement[] prior to adoption" of the *ISP Remand Order*. *Id.* at 9188, ¶ 81. It applied, for example, "when a new carrier enter[ed] a market or an existing carrier expand[ed] into a market it previously had not served." *Forbearance Order*, 19 FCC Rcd at 20182, ¶ 9. And its purpose, similar to that of the growth caps, was to prevent "expansion of the old compensation regime" during the transitional period. *ISP Remand Order*, 16 FCC Rcd at 9189, ¶ 81.

The basis for the FCC's decision to grant forbearance from application of the growth caps and new markets rule was the Commission's determination that "[m]arket developments since 2001 have eased the concerns about growth of dial-up ISP traffic that led the Commission to adopt these rules." *Forbearance Order*, 19 FCC Rcd at 20186, ¶ 20; *see id.* at 20186, ¶ 21. "Recent industry statistics indicate . . . declining usage of dial-up ISP services," the Commission noted. *Id.* at 20186, ¶ 20. In particular, the FCC cited an industry report indicating "that the number of end users using conventional dial-up to connect to ISPs is declining as the number of end users using broadband services to access ISPs grows." *Id.* The report showed a decline in the number of dial-up subscribers and forecasted a decline in the percentage of on-line subscribers using dial-up from 76% in 2002 to 25% in 2008. *See* Bernstein Research Call, DSL Economics I at 1 (Oct. 15, 2003) (J.A. 112). The Commission also cited FCC records showing a ten-fold increase in high-speed access lines between 1999 and 2003. *See* FCC Releases

Data on High-Speed Services for Internet Access at Tbl. 1 (June 8, 2004). With reduced concerns regarding "continued expansion of the arbitrage opportunity presented by ISP-bound traffic," *Forbearance Order*, 19 FCC Rcd at 20186, ¶ 20, the Commission concluded that "these concerns are now outweighed by the public interest in creating a uniform compensation regime," *id.* at 20186, ¶ 21, and that the public interest prong of § 160(a) was therefore satisfied, *see id.* at 20186-87, ¶¶ 20-21.

The same considerations led the Commission to conclude that the growth caps and new markets rule "are no longer necessary to ensure that charges and practices are just and reasonable, and not unjustly or unreasonably discriminatory." *Id.* at 20188, ¶ 24 (citing 47 U.S.C. § 160(a)(1)). As the FCC explained, "[b]oth the growth caps and new markets rule require carriers to exchange ISP-bound traffic on a bill-and-keep basis" where the provisions apply, while exchanging traffic under the reciprocal compensation regime (subject to the rate caps) where they do not. *Id.* at 20187-88, ¶ 24. Since the record "failed to demonstrate different costs in delivering traffic that would justify disparate treatment," "similar rates should apply to both local voice traffic and ISP-bound traffic, absent compelling policy reasons to the contrary." *Id.* at 20188, ¶ 24. And because the FCC found that "the policy rationale for those rules no longer outweighs policies favoring a unified compensation regime" in light of the "market developments" just discussed, the Commission "conclude[d] that forbearance is warranted." *Id.* The Commission reached the same conclusion with respect to the "protection of consumers" prong of § 160(a). *Id.* at 20189, ¶ 26.

B

The root of BellSouth's challenge to the FCC's grant of forbearance is an attack on the Commission's determination that market developments have eased the concerns about growth in dial-up usage that initially spurred promulgation of the growth caps and new markets rule.

BellSouth's first claim is that "the record was replete with evidence contradicting" that determination. BellSouth Br. 17. The principal evidence BellSouth cites is one of its own submissions. That submission does not dispute that there has been (and will be) a decline in the number of dial-up *subscribers*; to the contrary, it acknowledges that "the total subscriber base has gradually declined each year since" 2002 and "predicts a loss of 10 million subscribers" in "the next five years." Dial-Up Minutes of Use Chart (Sept. 2004) (J.A. 68). Instead, BellSouth focuses on the submission's projected increase in ISP-bound dial-up *minutes*, a projected increase of 3.5% from 2003 to 2006. *See* BellSouth Br. 17 (citing Dial-Up Minutes of Use Chart (J.A. 68)). That increase, however, still falls well short of the 7-10% projection that initially prompted the FCC to impose the growth caps, and also well below the 10% per year of growth (for each of the first two years) permitted under the caps themselves. *See ISP Remand Order*, 16 FCC Rcd 9191, ¶ 86. Moreover, the same BellSouth submission that projects a 3.5% increase from 2003 to 2006, predicts a more-than-offsetting decrease of 15.9% from 2006 to 2008 (the last year on the chart). *See* Dial-Up Minutes of Use Chart (J.A. 68).[5]

_____

[5]BellSouth also cites a submission by Qwest Communications declaring that Quest had experienced a 39% cumulative increase in dial-up minutes in its region from 2001 to 2004, *see* Qwest Letter to FCC at 3 (Oct. 5, 2004) (J.A. 124), and one on behalf of the

Shifting from the evidentiary to the theoretical, BellSouth attacks the FCC's prediction that there will be "'declining *usage* of dial-up ISP services'" based on evidence that shows only a decline in "'the number of *end users*.'" BellSouth Br. 19 (quoting *Forbearance Order*, 19 FCC Rcd at 20186, ¶ 20 (emphasis added by BellSouth)). This charge is, of course, hobbled from the start by BellSouth's own record submission, which projects a substantial decline in dial-up minutes (i.e., *usage*) by 2008. *See* Dial-Up Minutes of Use Chart (J.A. 68). In any event, "[u]nder the arbitrary and capricious standard of review, 'an agency's predictive judgments about areas that are within the agency's field of discretion and expertise' are entitled to 'particularly deferential' review, as long as they are reasonable." *Milk Industry Found. v. Glickman*, 132 F.3d 1467, 1478 (D.C. Cir. 1998) (quoting *International Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 821-22 (D.C. Cir.1983)).

There is nothing unreasonable about the FCC's reliance on a declining subscriber base to predict a decline in overall usage of dial-up service. Although BellSouth speculates that increased Internet usage per dial-up subscriber should be expected because such subscribers must remain online longer than broadband users to receive the same content, *see* BellSouth Br. 19,

---

Independent Telephone & Telecommunications Alliance (ITTA) stating that "dial-up still is the predominant method of ISP access in rural markets," ITTA Letter to FCC at 2 n.2 (Oct. 7, 2004) (J.A. 132). The FCC accurately characterizes these submissions as "anecdotal," "unsupported," and "logically . . . subsumed within the . . . industry-wide results that BellSouth proffered -- results that show essentially a plateau in dial-up minutes from 2004 through 2006, with an accelerating decline thereafter." FCC Br. 39. As such, these submissions are insufficient to call into question the reasonableness of the FCC's determination.

BellSouth cites nothing in the record to support that speculation. BellSouth also contends that forbearance from enforcing the growth caps and new markets rule will indirectly lead to increased payments from CLECs to ISPs, enabling the ISPs to make dial-up service more attractive by lowering their prices to subscribers. But, as the FCC responds, the record in the forbearance proceeding suggested that (inter alia) the increasing bandwidth requirements of popular website content will continue to erode dial-up usage notwithstanding a substantial price differential between dial-up and broadband service. *See* Bernstein Research Call, DSL Economics I at 2 (Oct. 15, 2003) (J.A. 113). Moreover, although the FCC has forborne from enforcing the growth caps and new markets rule, the rate caps remain in effect to cabin the intercarrier compensation that makes such subsidization possible.

Finally, BellSouth attacks the FCC for failing to provide a reasoned explanation for its forbearance decision. BellSouth insists that the regime adopted in the *ISP Remand Order* "was designed not merely to *reduce* the amount paid to competitors for ISP-bound calls[,] . . . but also to *induce* competitors to move away from ISP-only business models." BellSouth Br. 22-23. And it contends that the *Forbearance Order* failed to explain why this objective, which the FCC had regarded as important to the maintenance of viable local telephone competition,[6] was no longer applicable. *See id.* at 23-24.

We disagree. As noted above, the purpose of the growth caps and new markets rule was not to eliminate all market distortions attendant to a reciprocal compensation regime, but

---

[6]Section 160(b) provides that, "[i]n making the determination under subsection (a)(3)" that forbearance is consistent with the public interest, "the Commission shall consider whether forbearance . . . will promote competitive market conditions." 47 U.S.C. § 160(b).

rather "to ensure that *growth* in dial-up Internet access" and "*expansion* of the old compensation regime" would not undermine the FCC's efforts during the transition period. *ISP Remand Order,* 16 FCC Rcd at 9191, ¶ 86 (emphasis added); *id.* at 9189, ¶ 81 (emphasis added). Once the Commission determined that "[m]arket developments since 2001" had assuaged its concerns over such growth and expansion, it was reasonable for it to conclude that "the policies favoring a unified compensation regime outweigh any remaining concerns about the growth of dial-up Internet traffic." *Forbearance Order,* 19 FCC Rcd at 20186, ¶ 20. It is not for this court to second-guess the conclusion reached by the agency that Congress has entrusted with balancing those policies. *See Global Crossing Telecomms., Inc. v. FCC,* 259 F.3d 740, 746 (D.C. Cir. 2001); *Melcher v. FCC,* 134 F.3d 1143, 1152 (D.C. Cir. 1998).

IV

For the foregoing reasons, both the petition for review filed by Core and the petition for review filed by BellSouth are

*denied*.[7]

---

[7]Prior to filing its petition for review, Core filed a document -- styled as a "complaint for declaratory relief" -- claiming that Core's petition for forbearance was granted by operation of law once the statutory deadline passed. Core's effort to invoke this court's equitable jurisdiction by arguing that its complaint fits within the rule of *Telecommunications Research & Action Center v. FCC,* 750 F.2d 70 (D.C. Cir. 1984), is misplaced. We are fully capable of reviewing any future Commission decision to enforce any provision of the *ISP Remand Order* or *Forbearance Order* against Core, and there is no need "to issue [a] writ[] of mandamus . . . to protect [our] prospective jurisdiction." *Id.* at 76. We therefore dismiss Core's complaint.