# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 12, 2006       Decided December 1, 2006

No. 05-1032

BELLSOUTH TELECOMMUNICATIONS, INC.,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

---

On Petition for Review of an Order of the
Federal Communications Commission

---

*Jonathan E. Nuechterlein* argued the cause for petitioner. With him on the briefs were *Bradford M. Berry* and *David S. Mendel*.

*Robert B. McKenna, Jr., Edward H. Shakin, Michael E. Glover*, and *Scott H. Angstreich* were on the brief for *amici curiae* Verizon Telephone Companies, et al. in support of petitioner.

*Richard K. Welch*, Associate General Counsel, Federal Communications Commission, argued the cause for respondent. With him on the brief were *Thomas O. Barnett*, Assistant Attorney General, U.S. Department of Justice, *Robert B.*

*Nicholson* and *James J. Fredricks*, Attorneys, *Samuel L. Feder*, General Counsel, Federal Communications Commission, and *Eric D. Miller*, Acting Deputy General Counsel. *Daniel M. Armstrong*, Associate General Counsel, entered an appearance.

Before: TATEL and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

TATEL, *Circuit Judge*:   The Telecommunications Act of 1996 prohibits Bell Operating Companies, known as "Baby Bells," from discriminating in favor of their affiliates in the provision of services.  Responding to a complaint filed by AT&T, the Federal Communications Commission found that one of the Baby Bells, BellSouth Telecommunications, violated the act by creating a volume discount plan that, though facially neutral, favored small and growing companies such as its own affiliate.  Because we find the Commission's explanation for its action wanting, we vacate and remand.

## I.

This case concerns the market for what are known as "special access services."  Providers of special access, such as Petitioner BellSouth Telecommunications, offer their customers a dedicated connection between two points. *See WorldCom v. FCC*, 238 F.3d 449, 453 (D.C. Cir. 2001) (describing special access services).  Purchasers of special access are typically retailers: long-distance and internet service providers, as well as other companies that connect local customers to broader networks.

In 1999, BellSouth created the Transport Savings Plan (TSP), which gave its customers the option of earning price discounts in exchange for committing to purchase certain volumes of services for no less than five years.  The TSP

offered discounts on a tiered schedule, increasing with the number of years the customer had spent in the plan and with the customer's "committed volume level." Five years into the TSP, purchasers committing to at least $3 million of annual services received a 3% discount, those committing to $10 million received 5%, those committing to $100 million received 9%, those committing to $300 million received 10%, and those committing to $500 million received 12%. According to BellSouth, it chose this discount structure in order to "provide meaningful discounts to its entire eligible customer base," including small customers, which comprised "a growing segment of [its] market." J.A. 86 ¶ 46.

As a condition of receiving these discounts, BellSouth required customers to commit for five years to purchase each year no less than 90% of what they purchased on an annualized basis in the six months preceding their subscription to the plan. The TSP left customers seeking greater discounts free to increase their volume commitments, but at the time the Commission ruled on it–the decision at issue here–the TSP prohibited them from lowering their committed volume levels without permanently leaving the plan. Customers withdrawing early were liable for termination charges and those failing to meet their commitments were liable for shortfall charges. At the end of five years, BellSouth's customers retained the option of extending their discounts year by year at the same committed volume level and at the same discount. BellSouth explains that it adopted the 90% commitment requirement to maintain lasting and stable rates of utilization on its facilities–an objective that, according to BellSouth, is critical for companies like it that have high fixed costs and low marginal costs.

By 2004, the TSP had attracted thirteen subscribers: three at the lowest committed volume level, six at the next lowest level, two at the $100 million level, one at the $300 million level, and one at the $500 million level. Entering the TSP the day it debuted, AT&T committed to the minimum of 90% of past purchases. In the third year of the plan, AT&T, seeking greater discounts, voluntarily increased its committed volume level to next highest TSP revenue band. In so doing, AT&T committed itself to just under 100% of its purchases at that time, or 141% of its annualized purchases in the six months before entering the TSP. AT&T presumably made this choice expecting continued growth in demand, but after another year of solid growth in 2002, the company began feeling the effects of a market downturn. By 2004, AT&T's "headroom"–the margin between its committed volume level and its actual volume level–had shrunk to single digits in percentage terms, limiting AT&T's flexibility to move its traffic between carriers and increasing the risk of shortfall penalties.

In that year, AT&T filed a complaint with the Federal Communications Commission seeking to invalidate the TSP on the ground that the plan unlawfully discriminated in favor of BellSouth's affiliate, BellSouth Long Distance. BellSouth created BellSouth Long Distance in 1996 and over the next two years applied unsuccessfully to the Commission to secure operational authority for it. *See* 47 U.S.C. § 271(d) (requiring that Bell Operating Companies apply to the FCC for affiliate operational authority). Not until 2002, three years into the TSP, did BellSouth finally obtain operational authority for BellSouth Long Distance. Although the affiliate grew rapidly, it remained a relatively small purchaser of special access services, occupying the second lowest band of the discount structure (ranging from $10 million to $100 million) and

capturing less than 1% of the total discounts over the life of the TSP.

In its complaint, AT&T alleged, among other things, that BellSouth had violated 47 U.S.C. §§ 272(c)(1) and 272(e)(3). Section 272(c)(1) provides that Bell Operating Companies "may not discriminate between [its] affiliate and any other entity in the provision or procurement of goods, services, facilities, and information, or in the establishment of standards." Section 272(e)(3) has a narrower scope, providing that a "Bell operating company. . . .shall charge [its] affiliate. . . an amount for access to its telephone exchange service and exchange access that is no less than the amount charged to any unaffiliated interexchange carriers for such service." Under the statute's sunset provision, section 272(c)(1) ceases to apply to a Bell Operating Company three years after its affiliate has been authorized to provide services; section 272(e)(3), however, remains in force. 47 U.S.C. § 272(f)(1).

Treating sections 272(c)(1) and (e)(3) as interchangeable, the Commission split its inquiry in two, ruling that the TSP's discount structure and the 90% commitment requirement each independently violate section 272. BellSouth now petitions for review, finding fault with both rulings. In the meantime, BellSouth and AT&T have agreed to merge and now await regulatory approval. Approval of the merger would not moot this case because the Commission has ordered BellSouth to terminate the TSP with respect to all customers, not just AT&T. *In the Matter of AT&T Corp. v. BellSouth Telecomm.*, 19 FCC Rcd 23898, 23920 ¶ 61 (2004) (hereinafter FCC Order). We review the Commission's decision under the arbitrary and capricious standard, affirming if the Commission "considered the relevant factors and 'articulate[d] a rational connection

between the facts found and the choice made.' " *Earthlink, Inc. v. FCC*, 462 F.3d 1, 9 (D.C. Cir. 2006) (citation omitted).

## II.

Underlying its approach to both the discount structure and the 90% commitment requirement is the Commission's construction of section 272–a construction that has two key elements. First, drawing on its own precedent, the Commission decided that a facially neutral plan offered by a Bell Operating Company may violate section 272's bar on discrimination when such a plan is "in fact tailored to its affiliate's specific size, expansion plans, or other needs." FCC Order at 23904-05 ¶ 19 (2004) (quoting *Non-Accounting Safeguards Order*, 11 FCC Rcd 21905, 22028-29, ¶ 257 (1996)). Second, the Commission concluded that a Bell Operating Company may violate section 272 even absent a showing of discriminatory intent so long as its action discriminates in effect. FCC Order at 23913, ¶ 39. Based on this reading, the Commission declared itself free to disregard evidence tending to show that BellSouth lacked discriminatory intent when it created the TSP. Such evidence included the fact that BellSouth initiated the TSP three years before its affiliate obtained operational authority and that when BellSouth Long Distance entered the TSP it received a minuscule portion of the plan's overall discounts.

BellSouth hinted both in its brief and at oral argument that the Commission's interpretation of the statute may be unreasonable. Indeed, to defend its reading against a more frontal challenge than the one presented here, the Commission would have had to explain why the benefits of reading section 272 as broadly as it has done justify the inefficiencies that may result from frustrating Bell Operating Companies' attempts to maintain stable utilization rates on their networks

or to lower their prices. Nevertheless, we need not consider that issue because, even assuming the Commission correctly interpreted the statute, neither of its conclusions applying that interpretation withstand arbitrary and capricious review.

*Structure of TSP Volume Discounts*

The Commission's analysis centered on a comparison between the TSP's discount structure, which increases less quickly at higher volumes, to a hypothetical volume discount plan in which the percentage discount offered to customers varies in a linear–i.e., directly proportional–relationship to their committed volume levels. The Commission explained that it looks favorably on "typical" linear discount plans because they reflect "the ever-diminishing per-unit costs of providing service in increasingly higher volumes." FCC Order at 23905-06 ¶ 22. Measured against a linear plan, the TSP's discount structure favors small customers. To illustrate the point, the Commission produced the following table showing (in the right hand column) the percentage discounts in the hypothetical "proportional" discount plan rising in a linear relationship with the lower limit of the revenue bands (in the left-hand column):

Comparison of Discount Levels

| Customer Size (in eligible revenues) | under TSP (year 5) | under proportional volume discount plan |
|---|---|---|
| $3 - $10 million | 3% | 0.07% |
| $10 - $100 million | 5% | 0.24% |
| $100 - $300 million | 9% | 2.40% |
| $300 - $500 million | 10% | 7.20% |
| $500 - $600 million | 12% | 12.00% |
| over $600 million | 12.5% | 14.40% |

FCC Order at 23907.

Given the "dramatic[]" differences between the discounts in the TSP and the hypothetical linear plan, the Commission determined its precedent obligated BellSouth, using its own cost data, to justify the discount structure. FCC Order at 23909-10 ¶ 32 & n.86 (citing *Non-Accounting Safeguards Order*, *supra*). In other words, BellSouth had to show that its economies of scale resembled the TSP's diminishing, non-linear structure rather than the hypothetical linear model. Because BellSouth failed to do so, the Commission concluded the discount structure violated section 272.

As BellSouth points out, however, in comparing the TSP to a linear volume discount plan, the Commission neglected a critical fact, namely that the company had no obligation to offer a volume discount plan at all, much less a linear plan. Indeed, before 1999, BellSouth offered no volume discounts, nor was it obligated to do so after the Commission terminated the TSP. Therefore, in determining whether the TSP's discount structure is discriminatory it seems far more logical to compare it to the pre-TSP world of no volume discounts rather than to a hypothetical linear volume discount plan. Otherwise, section 272 would produce a headscratching outcome: non-volume based discounts (not to mention a discountless price structure), which would be vastly more favorable to BellSouth's affiliate, *would not* violate the statute, whereas marginally diminishing volume discounts, which are less favorable to its affiliate, *would* violate the statute.

Had the Commission taken this more natural approach, it would have had no basis for finding that the TSP advantaged BellSouth Long Distance. Indeed, compared to a world of no volume discounts, the TSP substantially

*disadvantaged* BellSouth Long Distance by giving it far smaller percentage discounts than its larger competitors. For instance, five years into the plan, a company at the $500 million level would have received a 12% discount, whereas a customer the size of BellSouth Long Distance would have received a 5% discount.

In its order, the Commission suggested that linear plans represent the appropriate basis of comparison because they are "typical." FCC Order at 23905-06, ¶ 22. Yet the Commission provided no evidence that any company offers a linear discount plan, much less evidence that such plans so pervade the industry as to form the appropriate basis for comparison. Of course, the Commission might have justified its approach by producing evidence that costs actually bear a linear relationship to volume such that one could conclude a non-linear plan like the TSP advantages small customers by allowing them to purchase at a price closer to cost than their larger competitors. Again, however, the Commission produced no evidence that marginal costs bear a linear relationship to volume either industry-wide or in BellSouth's case.

The Commission also claims that its own precedent required it to place the burden of cost justification on BellSouth and, therefore, to invalidate the TSP. The decision on which the Commission places greatest emphasis, however, *The Non-Accounting Safeguards Order*, *supra*, says nothing about measuring discrimination against a baseline of linear discounts. Rather, the pertinent part of that order states:

> Finally, we conclude that a complainant will be found to have established a <u>prima facie</u> case of unlawful discrimination under section 272(c)(1) if it can demonstrate that a [Bell Operating

> Company] has not provided unaffiliated entities the same goods, services, facilities, and information that it provides to its section 272 affiliate at the same rates, terms, and conditions. To rebut the complainant's case, the [Bell Operating Company] may demonstrate, among other things, that rate differentials between the section 272 affiliate and unaffiliated entity reflect differences in cost . . . .
> 11 FCC Rcd at 22004-05 ¶ 212 (emphasis in original).

Nothing in this passage, or for that matter anything else in the order, suggests the counterintuitive notion that no prima facie case arises when the company offers the same rates to affiliates and non-affiliates, but that one does arise when the Bell Operating Company offers rates that disadvantage its affiliate. Nor does anything else in the order suggest that non-linear volume-based prices advantage Bell affiliates. *See id.* at 22002, 22004-05, 22028-29 ¶ 206, 212, 257.

*The 90% Commitment Requirement*

The Commission found the 90% commitment requirement violated section 272 for two separate reasons. First, seizing on BellSouth's statement that but for the 90% commitment requirement it never would have offered the volume discounts, the Commission concluded the requirement was unlawful as an "inextricable component of the discriminatory effect" of the unlawful discount structure. FCC Order at 23911 ¶ 35. This reasoning is difficult to follow. It would be one thing for the Commission, given its decision to invalidate the discount structure, to have decided that the appropriate remedy also requires voiding the 90% commitment requirement, lest BellSouth's customers be forced into a one-sided bargain. It is quite another thing to

have ruled that the 90% commitment requirement violates section 272 because of its association with the unlawful discount structure.  In any event, given our decision to vacate the Commission's ruling that the discount structure violates section 272, the Commission's guilt-by-association rationale no longer applies.

The Commission's second reason for invalidating the 90% commitment requirement deserves more careful attention.  The Commission found that the 90% requirement independently violated section 272 by giving an advantage to smaller, faster growing customers–like its affiliate, BellSouth Long Distance.  The Commission reasoned that the 90% requirement functions like a "growth discount," a device that links prices to the rate of growth in committed volume or actual volume on the local exchange carrier's network.  In an earlier decision, the Commission had found growth discounts to discriminate in favor of Bell affiliates because Bell affiliates–which begin their operations with no customers, but because of their affiliation have abundant business contacts and name recognition from which to build–are inherently likely to grow rapidly and thus to obtain greater discounts. *In the Matter of Access Charge Reform Price Cap Performance Review for Local Exchange Carriers*, 11 FCC Rcd 21354, 21437-38 ¶ 192 (1996).

According to the Commission, the 90% commitment requirement functioned in the same way because it imposed a lesser burden on rapidly growing companies, such as its own affiliate.  Given that all customers, regardless of their size, must commit to no less than 90% of past purchases, it follows that more rapidly growing customers will build up more "headroom"–again, the margin between a company's committed volume level and its actual purchases–lessening the risk of shortfall charges and allowing them greater

flexibility in managing their traffic. By contrast, the Commission predicted that established companies "will likely experience diminishing headroom and, thus, diminishing flexibility in how they manage that traffic." FCC Order at 23912 ¶ 38.

In response, BellSouth argues that nothing in the Commission order demonstrates that the 90% commitment requirement in fact harmed any of its putative victims–the large, established companies. Put differently, according to BellSouth, the TSP could not have imposed a discriminatory burden on its large subscribers if, in fact, it had imposed no burden on them at all.

BellSouth's argument is well taken. The Commission's discussion of how the four largest, most established companies fared under the 90% commitment requirement identifies not one company that was injured by the rule, as opposed to other factors. Contained in a single footnote, that discussion states that the "headroom of the four largest TSP subscribers has been stagnant or shrinking." FCC Order at 23912 n.106. True enough, but that hardly demonstrates that these companies have actually been harmed or will be harmed by the 90% commitment requirement itself, a point that becomes clearer when the four companies are considered individually. Two of the companies, AT&T and Qwest, voluntarily increased their commitment levels above the 90% requirement by large margins–leading BellSouth to accuse AT&T of invoking the administrative process in an attempt to free itself from the "once-promising bargain it struck years before." Pet'r's Br. 32. Regardless of AT&T's motivation, however, it remains true that whatever problems AT&T and Qwest might have experienced due to their lack of headroom are more appropriately attributed to their free choice than to the 90% commitment requirement. Had they

not voluntarily increased their commitments, each would have had vastly more headroom: 62% for AT&T and 283% for Qwest. To be sure, BellSouth Long Distance's headroom of 608% was higher still. But the Commission has given us no basis for believing that differences at these levels are material. A third large company, Sprint, saw its headroom grow substantially over its five years in the TSP, ending at a level more than double the plan's average. Again, without more explanation, we cannot discern what harm, if any, Sprint suffered due to the 90% requirement. MCI/Worldcom, the fourth company in this class, appears to have been the only one constrained by the 90% commitment requirement rather than by its own voluntary choice. But given that company's unique experience–financial scandal and bankruptcy during the period of the TSP–its example provides scant support for the Commission's assertion that the 90% commitment requirement imposed substantial burdens on large, established companies.

We cannot overlook the absence of record evidence showing that the 90% commitment requirement harmed its putative victims simply because the Commission cast its analysis as a prediction of future trends–a prediction the Commission insists merits special deference. Resp't's Br. 22. It is certainly true that "'an agency's predictive judgments about areas that are within the agency's field of discretion and expertise' are entitled to 'particularly deferential' review, as long as they are reasonable." *In re Core Commc'ns*, 455 F.3d 267, 282 (D.C. Cir. 2006) (citation omitted). That said, the deference owed agencies' predictive judgments gives them no license to ignore the past when the past relates directly to the question at issue. In this case, the Commission had nearly five years of data against which to test the proposition that the 90% requirement burdened large and established companies. Moreover, those five years included a market downturn,

precisely the type of event one might expect to make the 90% commitment requirement burdensome and which the Commission now describes as having "exacerbated the discriminatory effect of the tariff." Resp't's Br. 40. Given this ample record, the Commission should either have shown how the large companies had nonetheless been harmed in the past five years or offered some reason for believing that the future is likely to differ from the past. It did neither.

Finally, viewing the TSP as a whole eliminates any doubt that the Commission's failure to show that the 90% commitment requirement harmed its putative victims requires vacating the order. The TSP is most naturally viewed as a bargain containing terms that both benefit and burden its subscribers. Thus, the Commission may be correct that because the 90% requirement is more likely to constrain the volume of services the larger, more established companies purchase, those companies give up more in the TSP than do their smaller, more quickly growing rivals. But it is also true that the larger companies get more from the TSP in the form of substantially higher discounts. Therefore, the TSP cannot have discriminated against the large companies unless the additional burden imposed upon them by the 90% commitment requirement exceeded the additional benefits they received from the higher percentage discounts. As we have explained, however, the Commission has failed to show that the large, established companies were at all harmed by the 90% commitment requirement, much less that the relative harm to them exceeded the relative benefits. Thus, without further explanation, the Commission's order finding the 90% commitment requirement unlawful cannot stand.

**IV.**

Finding the Commission's explanation inadequate with respect to both the discount structure and the 90% commitment requirement, we vacate and remand for further proceedings consistent with this opinion. On remand, the Commission must take account of the fact that, due to the statute's sunset provision, section 272(c)(1) no longer applies to BellSouth. 47 U.S.C. §§272(f)(1). Therefore, the only applicable provision is section 272(e)(3), which does not use the term "discriminates," but provides that a Bell Operating Company shall charge its affiliate "an amount for access to its telephone exchange service and exchange access that is no less than the amount charged to any unaffiliated interexchange carriers for such service."

*So ordered.*