# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 6, 2007         Decided March 23, 2007

No. 05-1450

QWEST CORPORATION,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,
RESPONDENTS

MCLEODUSA TELECOMMUNICATIONS SERVICES, INC., ET AL.,
INTERVENORS

———

Consolidated with
05-1469, 06-1014, 06-1039, 06-1043

———

On Petitions for Review of an Order of the
Federal Communications Commission

———

*L. Andrew Tollin* argued the cause for petitioner Qwest Corporation. With him on the briefs were *Michael Deuel Sullivan* and *Robert B. McKenna.*

*David P. Murray* and *Russell M. Blau* argued the cause for CLEC Petitioners. On the briefs were *Thomas Jones*, *Randy J. Branitsky*, *Richard M. Rindler*, *Patrick J. Donovan*,

*Joshua M. Bobeck,* and *Mary C. Albert. Jason D. Oxman* entered an appearance.

*Joseph R. Palmore*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Thomas O. Barnett*, Assistant Attorney General, U.S. Department of Justice, *Catherine G. O'Sullivan* and *Nancy C. Garrison*, Attorneys, *Samuel L. Feder*, General Counsel, Federal Communications Commission, *Eric D. Miller*, Deputy General Counsel, *John E. Ingle*, Deputy Associate General Counsel, and *Nandan M. Joshi*, Counsel.

*L. Andrew Tollin*, *Michael Deuel Sullivan*, *Robert B. McKenna*, *Scott H. Angstreich*, *Michael E. Glover*, and *Edward H. Shakin* were on the brief for intervenors Qwest Corporation and the Verizon Companies in support of respondents.

*David E. Mills* and *J. G. Harrington* were on the brief for intervenor Cox Communications, Inc.

Before: GRIFFITH and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Qwest, the incumbent local exchange carrier ("ILEC") in Omaha, Nebraska, petitioned the Federal Communications Commission for forbearance under § 10(c) of the Communications Act, 47 U.S.C. § 160(c), from some of its obligations under §§ 251(c) and 271 of the Act, 47 U.S.C. §§ 251, 271, in the Omaha Metropolitan Statistical Area ("MSA"). The Commission granted the petition in part, relieving Qwest of the duty to provide its competitors access to certain unbundled network

elements. *In re Petition of Qwest Corporation for Forbearance Pursuant to 47 U.S.C. § 160(c) in the Omaha Metropolitan Statistical Area*, 20 FCC Rcd 19,415 (2005) ("*Order*"). Qwest and several competing local exchange carriers ("CLECs") now seek review of various aspects of the Commission's order.

Qwest asserts that the Commission failed to act on its forbearance request before a statutory deadline, and that therefore the petition should have been "deemed granted" in full. The CLEC petitioners, in turn, challenge the Commission's grant of forbearance as to §§ 251(c)(3) and 271(c)(2)(B)(ii), attacking the Commission's interpretation of § 10(d) of the Act as unreasonable and its analysis under § 10(a) and (b) as arbitrary and capricious. Qwest's claim, however, is barred by the exhaustion requirement of 47 U.S.C. § 405(a), a conclusion compelled by *In re Core Communications, Inc.*, 455 F.3d 267 (D.C. Cir. 2006) ("*Core*"). We find the CLECs' claims ill-founded.

\* \* \*

Qwest's petition requested forbearance from many of the statutory and regulatory obligations to which it is subject as the incumbent local exchange carrier in the Omaha MSA, including its obligations under § 251(c) and the "competitive checklist" requirements of § 271(c)(2)(B)(i)-(vi) and (xiv). *Order*, 20 FCC Rcd at 19,416 ¶ 1 n.2. Section 10 of the Act provides that the Commission "shall forbear from applying any regulation or any provision" if it determines that: (1) the enforcement of such a regulation or provision is not necessary to ensure that rates or services are "just and reasonable and are not unjustly or unreasonably discriminatory"; (2) enforcement is "not necessary for the protection of consumers"; and (3) forbearance from applying such a regulation or provision is

"consistent with the public interest." 47 U.S.C. § 160(a)(1)-(3). In evaluating the public interest, the Commission must ask whether forbearance "will promote competitive market conditions." *Id.* § 160(b). Section 10(d) provides that no petition for forbearance may be granted as to the obligations in §§ 251(c) or 271 until the Commission "determines that those requirements have been fully implemented." *Id.* § 160(d).

Any petition for forbearance "shall be deemed granted if the Commission does not deny the petition . . . within one year after the Commission receives it," unless the Commission extends the deadline "an additional 90 days." *Id.* § 160(c). The Commission timely granted itself a 90-day extension and, on the last day of the extended period, issued a news release announcing that it had voted to grant Qwest's petition in part. News Release, FCC Grants Qwest Forbearance Relief in Omaha MSA, Sept. 16, 2005, Joint Appendix at 652. The release stated that the Commission was relieving Qwest of the "obligation to provide unbundled network elements (UNEs) to competitors in 9 of Qwest's 24 wire center service areas," noting "the substantial infrastructure investment made by Cox Communications, Inc. in its competitive network" in the Omaha MSA. *Id.* The release explained, however, that the Commission was leaving in place the other requirements of § 251(c), as well as the obligation under § 271 to provide wholesale access to local loops, transport, and switching at just and reasonable prices. *Id.*

The Commission issued the text of its *Order* on December 2, 2005, stating, anomalously, that its "decision shall be effective on Friday, September 16, 2005." 20 FCC Rcd at 19,471 ¶ 112 & n.282. As prefigured in the release, the *Order* granted Qwest forbearance from providing unbundled loops and dedicated transport elements under 47 U.S.C. § 251(c)(3), as well as related obligations in

§§ 251(c)(6) and 271.  The Commission found those sections to have been "fully implemented" within the meaning of § 10(d).  20 FCC Rcd at 19,439 ¶ 51.  The "substantial intermodal competition" provided by Cox's voice-enabled cable plant was "sufficient" to merit forbearance, the Commission held, in light of the continued applicability of other statutory and regulatory provisions designed to promote competition, such as the resale and interconnection requirements under § 251(c)(4), and access to loops, switching, and transport services under § 271(c)(2)(B)(iv)-(vi).  20 FCC Rcd at 19,444, 19,446 ¶¶ 59, 62.  The Commission relieved Qwest from the application of certain "dominant carrier" regulations under 47 U.S.C. § 214 and 47 C.F.R. §§ 61.38 & 61.41-.49 (2006) in mass market switched access and mass market broadband Internet access services, but it denied the petition in all other respects.  *Id.* at 19,417 ¶ 2, 19,424 ¶¶ 15-16.

\* \* \*

We begin with Qwest's claim that its petition should have been "deemed granted" under § 10(c) because the Commission's actions (a vote and press release) did not constitute a "den[ial]" under § 10(c).

47 U.S.C. § 405(a) provides that "[t]he filing of a petition for reconsideration shall not be a condition precedent to judicial review of any such order [of the Commission] . . . except where the party seeking such review . . . relies on questions of fact or law upon which the Commission . . . has been afforded no opportunity to pass."  As we noted in *Core*, this circuit has "strictly construed" § 405(a), "holding that we generally lack jurisdiction to review arguments that have not first been presented to the Commission."  455 F.3d at 276 (internal quotation marks omitted).  While the statute does not

require that the Commission's opportunity "be afforded in any particular manner, or by any particular party," *Coalition for Noncommercial Media v. FCC*, 249 F.3d 1005, 1008 (D.C. Cir. 2001), the Commission must have somehow been put on notice of the problem. *Time Warner Entertainment Co. v. FCC*, 144 F.3d 75, 79 (D.C. Cir. 1998) ("*Time Warner*").

Qwest acknowledges both the fact that it never raised the issue before the Commission and the principle that failure to do so isn't excused merely because the issue arose unequivocally only at the moment the Commission took action. That principle is clear. In *Core*, as here, the Commission voted to deny a petition for forbearance and issued a press release within the statutory deadline, publishing its written order only after the deadline had passed; like Qwest, Core then argued, without seeking reconsideration, that its petition should be "deemed granted." 455 F.3d at 274-75. Yet, noting our precedents under § 405(a), we held that "even when a petitioner has no reason to raise an argument until the FCC issues an order that makes the issue relevant, the petitioner must file a petition for reconsideration with the Commission before it may seek judicial review." *Id.* at 276-77 (internal quotation marks omitted).

Qwest tries to distinguish *Core* by noting a subtle difference between its claim and Core's. Whereas Core argued that the Commission was bound by § 10(c) to issue a fully fledged explanation of its ruling by the deadline (on pain of the petition's being deemed granted), Qwest argues more modestly that § 10(c) requires simply a "legally effective public notice" with "enough detail about the rulings to allow the parties to alter their course of conduct." Qwest Reply Br. at 5. This situates Qwest's claim (it says) under "step one" in the conventional lexicon of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), i.e., a claim to which Congress has spoken "directly." By contrast,

Qwest locates Core's claim under "step two," pointing to our statement in *Core* that we would "ordinarily accord deference to the Commission's interpretation of . . . § 160(c)" under *Chevron*, and that petitioner's failure to have raised its claim before the Commission "create[d] a problem regarding the extent of deference we owe the FCC's statutory interpretation." *Core*, 455 F.3d at 276. Exhaustion under § 405(a) would serve no purpose here, Qwest contends, because its claim is that the Commission violated the plain meaning of § 10(c), a question on which a reviewing court would owe the Commission no deference.

We think Qwest has misread *Core* on two levels. First, we see no evidence that the court judged Core's claim to fall within step two. The court never embarks on an exegesis of § 10(c), thus exercising a self-restraint wholly in keeping with one of the functions of exhaustion doctrine—to avoid premature judicial pronouncements. Moreover, the court's statement quoted above—that we would "ordinarily accord deference to the Commission's interpretation of . . . § 160(c)"—makes complete sense as a simple recognition that a Commission reading of § 10(c) would fall within the general bailiwick of *Chevron* analysis.

Second, even if *Core* had classified Core's argument as belonging to step two, exhaustion is not excused simply because we might owe an agency no deference. Section 405(a) applies on its face to all "questions of fact or law." 47 U.S.C. § 405(a). This court has frequently required § 405 exhaustion for questions on which the Commission would have received no deference. See, e.g., *Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344, 349 & n.6 (D.C. Cir. 1998) (First Amendment claim); *Time Warner*, 144 F.3d at 80 (collecting cases requiring exhaustion for asserted violations of Administrative Procedure Act). In fact, we have been "sticklers" in requiring § 405(a) exhaustion where a party

"complains of only a technical or procedural mistake, such as an obvious violation of a specific APA requirement." *Id.* at 80-81.

Moreover, although courts have acknowledged the relationship between administrative exhaustion and deference to administrative agencies, see *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992), exhaustion serves other purposes as well. For instance, "'[o]ne of the purposes of [section 405] is to afford the Commission the initial opportunity to correct errors in its decision or the proceeding leading to decision'"— a goal equally applicable here. *Time Warner*, 144 F.3d at 80 (quoting *Rogers Radio Communication Services v. FCC*, 593 F.2d 1225, 1229 (D.C. Cir. 1978)) (alterations in original); see also *McCarthy*, 503 U.S. at 145 (exhaustion discourages disregard of agency procedures); *Woodford v. Ngo*, 126 S. Ct. 2378, 2385 (2006) (agency proceedings "generally . . . resolve[] [claims] much more quickly and economically" than courts and "may produce a useful record for subsequent judicial consideration").

Qwest next attempts to distinguish *Core* by arguing that the Commission here had already provided its view on the issue, i.e., it had had an "opportunity to pass" for purposes of § 405(a). Qwest relies primarily on the *Order*'s reference to § 10(c) in its effective date paragraph, 20 FCC Rcd at 19,471 ¶ 112 & n.282, and a footnote from a report unrelated to the instant proceedings, *In re 2002 Biennial Regulatory Review*, 18 FCC Rcd 4726, 4739 ¶ 33 n.70 (2003) ("[F]ailure to act on [a § 10] forbearance petition within [the] statutory period causes it to be granted by operation of law."); see also *Petition of Core Communications, Inc. for Forbearance under 47 U.S.C. § 160(c) from Application of the ISP Remand Order*, 19 FCC Rcd 20,179, 20,189 ¶ 28 & n.74 (2004) (noting § 10(c)'s requirements and the statutory consequences of failure to meet the deadline). But while the cited phrases

manifest Commission awareness of the statutory deadline, they cannot be described as dispositions of an (unmade) claim that a vote and press release on the statutory deadline could not qualify as a "den[ial]" under § 10(c).  See Qwest Br. at 3. Moreover, Qwest ignores our recent statement in *Core*—where the Commission had employed an effective-date provision virtually identical to the one here—that § 405(a) barred us from being "the first authority to construe the meaning" of § 10(c).  455 F.3d at 277.

Finally, Qwest urges us to recognize certain exceptions to the exhaustion requirement:  where agency action is alleged to be ultra vires, and where seeking an agency's view would be futile.   In fact, the parties dispute the existence of such exceptions.  Compare *Washington Ass'n for Television & Children v. FCC*, 712 F.2d 677, 681-82 (D.C. Cir. 1983) ("*WATCH*") (interpreting § 405 to "permit[] courts some discretion to waive exhaustion"), and *Petroleum Communications, Inc. v. FCC*, 22 F.3d 1164, 1170 (D.C. Cir. 1994) (discussing futility and "patent violation[s] of the agency's statutory authority" as "recognized exceptions" to exhaustion requirement), with *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001) ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise."), and *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004) ("If the statute does mandate exhaustion, a court cannot excuse it."). We need not, however, resolve this disagreement; even assuming the availability of such exceptions, Qwest has failed to show that either applies.

In its ultra vires arguments, Qwest looks to *WATCH*'s statement that exhaustion may be excused for challenges to agency action "'patently in excess of [the agency's] authority.'"  712 F.2d at 682 (quoting *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 312 n.10 (1979)) (alteration in original);

see also *Petroleum Communications*, 22 F.3d at 1170 (implying readiness to except "patent violation[s]" of statutory authority from § 405(a)).  Whatever the exact meaning of § 10(c), we can't say that the Commission's action here falls into the outer darkness of a "patent" violation.  See also *Mitchell v. Christopher*, 996 F.2d 375, 378 (D.C. Cir. 1993) (ultra vires exception limited to "challenges that concern the very composition or 'constitution' of an agency"); *Northwest Airlines, Inc. v. FAA*, 14 F.3d 64, 73 (D.C. Cir. 1994) (failure to raise an issue "will not be excused merely because the litigant couches its claim in terms of the agency's exceeding its statutorily-defined authority or 'jurisdiction'").

As to futility, our decisions entertaining the exception have demanded a very convincing record.  In *Omnipoint Corp. v. FCC*, 78 F.3d 620 (D.C. Cir. 1996), for example, we found futility only where the Commission "was rapidly expediting the proceeding and appeared 'wedded to the procedures that it had employed.'"  78 F.3d at 635 (quoting *City of Brookings Municipal Tel. Co.*, 822 F.2d 1153, 1163 (D.C. Cir. 1987)).  Similarly, in *Tribune Co. v. FCC*, 133 F.3d 61, 67 (D.C. Cir. 1998), we suggested that futility was appropriate only where the Commission's position had "crystallized" or where the Commission was "firmly entrenched."  And in *Nat'l Science and Technology Network, Inc. v. FCC,* 397 F.3d 1013, 1014 (D.C. Cir. 2005), we said that futility required a "showing that an adverse decision was a certainty."

Here Qwest points to little more than the agency's treatment of Core's petition, where it had taken a similar approach (vote and press release on the deadline, with decision to follow).  And in this case, it says, the timeliness arguments advanced in *Core* put the Commission on notice about disagreement with its reading of § 10(c).  But one swallow doesn't make a summer, and Qwest points to no case

(and we are aware of none) in which a single adverse decision by an agency, without more, demonstrated that its position had "crystallized" or that a future result was "a certainty."

Qwest adds that the § 10(c) deadline would not bind the Commission's consideration of a petition for reconsideration. True enough, though hardly assurance that the Commission would drag its feet on such a petition, especially with the potential of a mandamus action hovering in the background. Moreover, the Commission's treatment of the deadline on Core's petition occurred in October 2004, see *Core*, 455 F.3d at 274, at which point Qwest's petition had been pending for four months. Qwest's failure at that point to file a memo insisting on its view of § 10(c) undermines its reliance on the risk of delay inherent in a post-decision petition for reconsideration.

Thus we reject Qwest's claim as barred by the exhaustion requirement of § 405(a).

* * *

We next turn to the CLEC petitioners' claims, beginning with their contention that § 251(c) was not "fully implemented" for the purposes of § 10(d). Our review of an agency's interpretation of the statute it administers is governed by the familiar *Chevron* framework, under which we ask first whether Congress has "directly spoken" to the precise issue before us and, if it has not, whether the agency's interpretation is reasonable. 467 U.S. at 842-43; see also *Cellular Telecommunications & Internet Ass'n v. FCC*, 330 F.3d 502, 507 (D.C. Cir. 2003).

Section 10(d) of the Act provides that "the Commission may not forbear from applying the requirements of section

251(c) or 271 . . . until it determines that those requirements have been fully implemented." 47 U.S.C. § 160(d). In the *Order*, the Commission held that § 251(c) had been fully implemented "because the Commission has issued rules implementing section 251(c) and those rules have gone into effect." 20 FCC Rcd at 19,440 ¶ 53. The Commission reasoned that "[the FCC itself] is the entity that 'implements' section 251(c)," noting that § 251(d)(1) requires the Commission to "complete all actions necessary to establish regulations to implement the requirements of [§ 251]." *Id.*

The CLECs dispute the Commission's reliance on § 251(d), and draw a contrast between that subsection's requirement that "the Commission . . . complete all actions necessary to establish regulations to implement" § 251(c) and § 10(d)'s reference to "*fully* implemented." 47 U.S.C. §§ 160(d), 251(d) (emphasis added). The Commission's reading of § 10(d), they argue, gives no meaning to the term "fully," which in their view must implicate something more than the rulemaking contemplated by § 251(d). But the Commission stated that § 251(c) would be fully implemented only "once the Commission has completed its work of promulgating rules implementing section 251(c) *and those rules have taken effect*." 20 FCC Rcd at 19,440 ¶ 54 n.135 (emphasis added). We cannot say that such a reading is unreasonable. The statute does not define "implemented," an ambiguity not clearly resolved one way or the other by reference to § 251(d). The Commission's interpretation does give independent meaning, albeit a modest one, to the term "fully"—i.e., that regulations have both been promulgated and taken effect. In addition, it might well be thought that completion of "*all* actions *necessary* to establish regulations to implement" a section would naturally add up to "full[] implement[ation]" of that section. We also note petitioners' failure to have offered any workable alternative test. See CLEC Br. at 41.

The CLECs further believe that under the plain language of § 251 the Commission can make a finding of full implementation of § 251(c) only if it can point to implementing action *by the ILECs*. To support this notion they point to the Commission's own analysis in the Section 271 Broadband Forbearance Order, *In re Petition for Forbearance of the Verizon Telephone Companies Pursuant to 47 U.S.C. § 160(c)*, 19 FCC Rcd 21,496 (2004), where it rested a finding of implementation of the competitive checklist requirements of § 271(c) on the Bell Operating Companies' having established compliance with those requirements and having secured entitlement to provide in-region interLATA service. *Id*. at 21,503 ¶¶ 15-16; see also *Order*, 20 FCC Rcd at 19,440-41 ¶ 54. Even assuming the CLECs' reading of § 10(d) is reasonable, the Commission's is also: "[T]he BOCs [Bell Operating Companies] have a role in implementing section 271(c) that incumbent LECs do not have in implementing section 251(c)." *Order*, 20 FCC Rcd at 19,441 ¶ 54. In one case, company action subjects a company to the duties in question; in the other, Commission action does so. The Commission's reading of § 10(d) reflects that distinction.

We are equally unconvinced by petitioners' argument that the Commission's interpretation would allow forbearance from § 251(c) before the benefits from unbundling were "significantly realized." This disregards the independent requirements of § 10, such as § 10(b)'s mandate to consider whether forbearance would "promote competitive market conditions."

Finally, the CLEC petitioners complain that the Commission's interpretation of § 10(d) is inconsistent with a 1996 order, *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd 15,499 (1996) ("*Local Competition Order*"), which they

believe contemplates a role for States and service providers in implementing § 251(c) inconsistent with the Commission's application of § 10(d) here. This is distinct from arguments based on the plain language of § 10(d) or the alleged inconsistency with the Commission's analysis of forbearance from § 271 duties. But the argument is barred under § 405(a) because the Commission never had an "opportunity to pass" on it. Indeed, the CLECs appear to concede that the 1996 order was never mentioned in the proceedings below. CLEC Reply Br. at 14. See *Cellco Partnership v. FCC*, 357 F.3d 88, 102 (D.C. Cir. 2004) ("[Where petitioner] never argued to the Commission that its decision [on review] . . . was inconsistent with its [prior] decision . . . it cannot now argue that the Commission erred by failing to reconcile these two decisions."). Nor was the substance of the inconsistency claim presented well enough to satisfy § 405(a), especially in light of our admonition that the Commission "need not sift pleadings and documents to identify arguments that are not stated with clarity by a petitioner." *Bartholdi Cable Co. v. FCC*, 114 F.3d 274, 279 (D.C. Cir. 1997) (internal quotation marks omitted). None of the various record citations to which the CLECs refer, see CLEC Reply Br. at 14 n.5, is plausibly read as presenting the argument that the Commission's proposed reading of § 10(d) was inconsistent with a prior Commission order discussing the roles of states and service providers under § 251(c).

\* \* \*

Last, we reach the CLECs' challenges to the Commission's forbearance analysis under § 10(a) and (b). Our review here is governed by 5 U.S.C. § 706(2)(A), under which we set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." See *AT&T Inc. v. FCC*, 452 F.3d 830, 837 (D.C. Cir. 2006).

The *Order* grants Qwest forbearance from the obligation to provide unbundled loops and transport in "9 of Qwest's 24 wire centers in the Omaha MSA where competitive deployment is greatest." 20 FCC Rcd at 19,444 ¶ 59. The Commission "tailor[ed] Qwest's relief" to Cox's "extensive" voice-enabled cable network, selecting nine wire centers in which "sufficient facilities-based competition" existed "to ensure that the interests of consumers and the goals of the Act [were] protected under the standards of section 10(a)." *Id.* at 19,444-46 ¶¶ 59, 61-62. The Commission also relied on competitors' continued access to interconnection rights under § 251(c) and to Qwest's loops, switching and transport under § 271(c)(2)(b)(iv)-(vi). *Id.* at 19,446-47 ¶¶ 62, 64.

Although the Commission recognized that Cox's market share was larger in the residential than the enterprise market, it concluded that Cox nonetheless posed a "substantial competitive threat to Qwest" in both sectors. *Id.* at 19,448 ¶ 66. Cox had proven itself a "very successful[]" competitor even in the mass market (where revenue potential was "relatively low" compared to the enterprise market), was "actively marketing" itself to enterprise customers, had won over a "large number of significant Omaha businesses," and had doubled its enterprise sales in Omaha each year for five consecutive years. *Id.* Moreover, Cox had relevant technical expertise, economies of scale and scope, sunk investments in network infrastructure (implying that the incremental costs for continuing and extending service would be relatively modest), and an established presence and brand in the Omaha MSA. *Id.*

In challenging the Commission's reliance on Cox's activities, the CLECs point to the Commission's discussion in

16

its 2005 unbundling order, in which it declined to find that cable company competition *throughout the country* justified relieving ILECs of their obligation to provide unbundled network elements, and claim that "nothing" in the record distinguishes Cox from those facts. See *In re Unbundled Access to Network Elements, Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 20 FCC Rcd 2533, 2556-57 ¶ 39 (2005) ("*Triennial Review Remand Order*," or "*TRRO*"). But the *TRRO* explicitly noted that these matters varied by geographic market. *Id.* Cox's filings here, in fact, demonstrate its substantial coverage of the enterprise market, including provision of DS0 loops to business users. *Order*, 20 FCC Rcd at 19,450-51 ¶ 69. And we see nothing unreasonable in the factors invoked by the Commission—enumerated above—in forecasting an increase in competition. See *id.* at 19,448 ¶ 66.

The CLECs also contend the Commission erred in relying on *average* network coverage across the nine wire centers, rather than examining each wire center individually. In theory the average could conceal substantial variation between individual centers, including possibly centers where Cox had no footprint at all. But in light of the Commission's reliance on data showing Cox's aggressive expansion in both the residential and enterprise markets, we cannot say that the possibility of wide variance in existing coverage is enough to undermine the Commission's conclusions.

Finally, petitioners take issue with the Commission's reliance on Qwest's wholesale offerings (ILEC plant usable by CLECs independently of the unbundled network element mandate) in granting forbearance in the enterprise and mass markets. These include both services Qwest is legally obliged to make available (under § 271(d)(2)(B)(iv)-(vi) and § 251(c)(4)) and ones it has offered voluntarily (such as Qwest Platform Plus ("QPP") services, which are

commercially negotiated wholesale services integrating loops, switching and transport into a single package).  See *Order*, 20 FCC Rcd at 19,448-50 ¶¶ 67-68.  The CLECs again point to the *TRRO*, in which the Commission declined to adopt a general rule relieving the ILECs of unbundling obligations in local exchange markets whenever "carriers are potentially able to compete using special access or other tariffed alternatives."  See *TRRO*, 20 FCC Rcd at 2560 ¶ 46.

But the *TRRO* explicitly recognized that an ILEC's tariffed offerings could, in certain circumstances, be an avenue for competitive entry.  See, e.g., *TRRO*, 20 FCC Rcd at 2561 ¶ 48 ("[A] carrier could, in theory, use [a] tariffed offering to enter a market.").  The Commission in fact relied on carriers' "successful[] use[] [of] special access to compete" in the wireless and long-distance markets in concluding that ILECs need no longer provide access to UNEs in those markets.  *Id.* at 2554-55 ¶ 36, 2560 ¶ 46.  With respect to local exchange services, the *TRRO* stated only that "the availability of a tariffed alternative should not *foreclose* unbundled access."  *Id.* at 2561 ¶ 48 (emphasis added).  As the *TRRO* explicitly left open the possibility that "sufficient facilities-based competition" might eventually make UNE relief appropriate in the local exchange market, either generally or in geographically specific markets, *id.* at 2556 ¶¶ 38 & 39 n.116, the *Order* seems simply to apply that concept:  here the Commission found the combination of tariffed ILEC facilities and facilities-based competition adequate to assure competition even if it partially relaxed Qwest's obligations in the Omaha market.  Compare *id.* at 2556-57 ¶ 39 with *Order*, 20 FCC Rcd at 19,447-49 ¶¶ 65 & 67 n.177.

The CLECs offer additional arguments, in part traceable to the Commission's language in the *TRRO*, as to why Qwest's wholesale services are not, on their own, a sufficient substitute for UNEs.  For instance, absent other avenues for

competition, ILECs could thwart competition by undue hikes in the price of their wholesale inputs. Similarly, the CLECs complain that the loop component of the QPP service was available as a § 251(c)(3) network element, and thus that the Commission was wrong to rely on the continued availability of QPP offerings in granting forbearance from unbundling. But Cox's independent cable infrastructure greatly mitigates these potential risks. In addition, the CLECs have provided no reason to disturb the Commission's predictive judgment that "Qwest will not react to [the forbearance] decision . . . by curtailing wholesale access" to its high-capacity offerings, especially in light of the Commission's finding that facilities-based competition from Cox gives Qwest a strong incentive to maximize use of its network by setting attractive prices on its wholesale alternatives. *Order*, 20 FCC Rcd at 19,448-49 ¶ 67, 19,455 ¶ 79.

In sum, we hold that the Commission reasonably concluded that § 251(c) was "fully implemented" for the purpose of § 10(d). Further, we find nothing arbitrary about granting forbearance in the nine wire centers, given Cox's extensive network coverage in the residential market and growing competitive presence in the enterprise market.

* * *

Accordingly, Qwest's petition is dismissed as barred by 47 U.S.C. § 405(a), and the CLECs' petitions are denied on the merits.

*So ordered.*